# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ALASKA

In re:

JTS, LLC,

   Debtor.

Case No. A15-00167-GS
Chapter 11

## MEMORANDUM ON JMJ PROPERTIES' MOTION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE CLAIM

JMJ Properties Companies[1] leased two properties to debtor JTS, LLC, one in Eagle River and the other in Wasilla. After the debtor filed its chapter 11 petition, it ultimately rejected the two leases with JMJ Properties, and vacated the two locations. JMJ Properties promptly filed its Motion for Allowance and Payment of Administrative Claim for Damages and Failure to Clean and to Receive Payment of Funds Held in Trust as Partial Payment ("Motion") (ECF No. 253). An evidentiary hearing on the Motion was held June 20, 2016, and the parties thereafter submitted supplemental briefing. For the reasons stated below, the court will grant the Motion, in part.

## I. Case Background.

Debtor JTS, LLC, doing business as Johnson's Tire Service, is a privately held limited liability company owned by Kelly Gaede. The business sells new tires, performs seasonal tire change overs, and offers automotive repair. It was formerly owned by James and Janet Johnson, who founded the business in 1982. The Johnsons sold the business to Mr. Gaede and other investors when they retired in 2006. The other investors subsequently sold their interests to Mr. Gaede, who is now the sole owner of the debtor, JTS.

The debtor filed its chapter 11 petition on June 15, 2015. At the time of filing, its

---

[1] JMJ Properties Companies consists of JMJ Properties ER, LLC, and JMJ Properties Wasilla, LLC. The two creditors are referred to herein collectively as "JMJ Properties."

corporate headquarters were located at 3330 Denali Street in Anchorage, a property that it purchased from the Johnsons as part of the sale of the business. The debtor leased five additional locations for the operation of its business, two in Anchorage, and locations in Eagle River, Wasilla, and Soldotna. JMJ Properties, whose principals are James and Janet Johnson, was the lessor of the Eagle River and Wasilla locations.

After the petition was filed, the leases for the debtor's business locations in Soldotna and South Anchorage were rejected. The debtor timely assumed the ground lease associated with its Denali Street headquarters, and moved for an extension of time to assume or reject its leases of the Wasilla and Eagle River buildings. JMJ Properties opposed the requested extension, and a hearing on the motion was held November 23, 2016. The parties subsequently participated in a successful round of settlement conferences before the Honorable Herb Ross, and on December 16, 2015, a Stipulated Order Resolving Motion to Extend Time to Assume or Reject Wasilla and Eagle River Leases and Related Issues (ECF No. 203)("Stipulated Order") was entered.

Under the Stipulated Order, the leases for both the Wasilla and Eagle River locations were rejected, effective February 29, 2016. The debtor vacated both locations at least by this date. However, JMJ Properties contends the debtor breached the terms of the leases and the Stipulated Order, and filed the instant Motion on March 14, 2016 seeking allowance of an administrative claim for damages to the properties that accrued after that order was entered. It says the debtor did not leave the leased premises "broom clean," as contractually required, and damaged equipment at both locations. JMJ Properties also seeks a court order directing that the $15,000.00 the debtor was required to deposit in its counsel's trust account, pursuant to the Stipulated Order, be disbursed to it to apply, pro-rata, against the damages incurred at each of the two leased locations.

The debtor opposes the Motion, arguing that representatives of JMJ Properties interfered with its business operations, frustrating clean up of the premises. It also contends that it was not

2

responsible for any of the damages claimed, or, alternatively, that JMJ Properties has overstated its damages.

An evidentiary hearing on the Motion was held June 20, 2016. After the parties submitted supplemental briefs in lieu of closing arguments, the matter was deemed submitted. The debtor's chapter 11 plan was confirmed on August 8, 2016. The Order Confirming Debtor's Third Amended Plan of Reorganization (ECF No. 366) required the debtor to place an additional $30,000.00 into its counsel's trust account pending the court's determination of JMJ Properties' administrative claim. The total being held in the trust account of the debtor's counsel, pending resolution of this matter, is now $45,000.00.

## II.    The Debtor's Obligations Under the Eagle River and Wasilla Leases.

The leases for the Eagle River and Wasilla locations contained the following provisions:

> 6.2 (a)   Lessee shall periodically paint the interior and exterior, and at its expense throughout the Term, maintain, repair, service, replace, and keep the interior structures, including such items as floors, ceilings, walls, plumbing, in-ground hydraulic lifts, waste oil burner, oil separator, bulk oil storage tanks, electrical, heating/ventilation, doors, glass, paint, and partitions in the Premises in as good condition as now exists, and surrender same upon expiration of the Term in the same condition as received, ordinary wear and tear excepted. Lessee shall, at its own expense, repair or replace with material of good quality, any damage to the Premises caused by Lessee's negligence or the actions of Lessee's licenses, invitees, customers, agents, employees, suppliers, or subcontractors.

> 6.3 (a)   Alterations, improvements, additions, utility installations or removal of any fixtures may not be made to the Premises without the prior written consent of Lessor, and any alterations, improvements, additions or utility installations to the Premises, excepting movable furniture and machinery and trade fixtures, shall, at the Lessor's option, become part of the realty and belong to Lessor upon the expiration of earlier termination of this Lease.[2]

A Modification Agreement entered by the parties July 1, 2008 with respect to both leases

---

[2] *See* JMJ Properties' Exs. B and C, at 4.

further provided:

> 4.    <u>Lease Terminations.</u>   Upon termination of any of the
> Leases, all of the fixed equipment and other fixtures, including but
> not limited to, counters, tire racking, shelving, floor-mounted and
> in-ground lifts, waste oil burners, air compressor systems,
> lubrication equipment, plumbing fixtures, and heating equipment
> related to the Lease shall remain at the facility; provided however
> Tenant shall remove any wall displays, pole signage, sign poles,
> and signage for the Lease, fill and replace landscaping for any pole
> holes and fill and paint any holes in the facility, unless Landlord or
> Lessor requests at least ten (10) days before termination of the
> Lease that Tenant not remove such tire mounted displays, poles or
> signage.[3]

Finally, the post-petition Stipulated Order specified that:

> 1.    The Leases are rejected and the Debtor shall vacate the
> leased premises on February 29, 2016 or earlier with the agreement
> of the Lessors, leaving them broom clean, free of hazardous
> materials and in a condition which complies with all applicable
> law, with the Debtor leaving all of the fixed equipment and other
> fixtures, including but not limited to, counters, tire racking,
> shelving, floor-mounted and in-ground lifts, waste oil burners, air
> compressor systems, lubrication equipment, plumbing fixtures, and
> heating equipment related to the leased premises at the facilities;
> provided however Debtor shall remove all wall displays, pole
> signage, sign poles, and signage for the leased premises, fill and
> replace landscaping for any pole holes and fill and paint any holes
> in the leased premises, unless Lessors shall request at least ten (10)
> days before departure that Debtor not remove such tire mounted
> displays, poles or signage. The Debtor will meet the requirements
> of paragraph 4., even if the Debtor leaves early by agreement.[4]

Paragraph 4 of the Stipulated Order required the debtor to maintain insurance, pay all

utilities, and be responsible for security at the leased premises through February 29, 2016.

Further, if the debtor ceased business operations at either location, it was to insure that the

---

[3] *See* JMJ Properties' Ex. E, at 1.

[4] Stipulated Order Resolving Motion to Extend Time to Assume or Reject Wasilla and Eagle River
Leases and Related Issues ("Stipulated Order"), ECF No. 203 at 1-2 (introduced as JMJ Properties' Ex. K).

premises were checked inside and out on a daily basis so that they were not damaged by vandalism or malfunctioning utilities.[5]  JMJ Properties was to be given access to the leased premises "on reasonable notice to inspect the leased premises, conduct repairs, or show the premises to potential tenants; such activities shall not interrupt the Debtor's business operations."[6]

The Stipulated Order required the debtor to pay rent at the lease rate for December 2015, but no rent was to be paid for January or February 2016.  However, the debtor was required to reimburse JMJ Properties for real estate taxes the lessor had paid on the Wasilla property. Additionally, the debtor was required to deposit $15,000.00 into its attorney's trust account "as security to reimburse the Lessors for any damages to the leased premises occurring between the date of this stipulation and February 29, 2016 for which the Debtor would be liable under the terms of the leases."[7]  Such funds could not be disbursed absent order of this court or by the parties' written agreement.  Finally, the Stipulated Order provided that JMJ Properties would withdraw its Proofs of Claim Nos. 24, 25, 31 and 35, and "shall have no administrative or unsecured claims in this bankruptcy case or against any affiliate of the Debtors except any such claims arising from events after December 8, 2015 or for breach of this agreement."[8]

## III.   The Dispute Evolves.

### A.   JMJ Properties' December 2015 Inspection.

On December 11, 2015, before the Stipulated Order was entered, James Johnson and Conor Williamson inspected both the Wasilla and Eagle River properties on behalf of JMJ

---

[5] *Id.* at 2.

[6] *Id.*, ¶ 3.

[7] *Id.* at 3, ¶ 6.

[8] Stipulated Order, ECF No. 203 at 3, ¶ 7.

Properties.[9]  Before the inspection, Mr. Williamson met with Mr. Johnson to create a list of questions to ask about each of the premises.  The list was based on information B&B Tool Service Co., LLC ("B&B") had earlier provided to Mr. Johnson from its own inspection of the two business locations.  B&B's owner, Rick Carr, testified that he had inspected the properties several times over the years for JMJ Properties, including an inspection in September 2015.

Only Mr. Johnson and Mr. Williamson performed the December 2015 inspection; Mr. Carr was not present.  They walked around the business premises with the debtor's managers at both locations.  Mr. Williamson testified that he and Mr. Johnson went over the questions from the list they had created, and inquired about the condition of various items at both locations.  He took handwritten notes regarding the inspection and the manager's responses, as well as several photographs.  He subsequently typed a summary of his notes, which was introduced as JMJ Properties' Exhibit L.  The summary reflected that most of the items in the Eagle River location were "good-no problems," with the exception of the lifts in the front bays, which were purported to have "problems per B&B Tool."[10]  More issues were found with respect to the Wasilla location.  In the employee break room, Mr. Williamson noted, "fan condemned" and "handle missing" in women's restroom," an "Infrared heater NE corner" was marked "out of service," and the "first four bays (front)" were listed as having "problems per B&B Tool."[11]

---

[9] Mr. Williamson is married to the Johnsons' granddaughter.

[10] JMJ Properties' Ex. L, at 6.  Specifically, the following items and areas in the Eagle River location were noted to be "good-no problems:" all in-ground lifts in the back bays, including alignment racks; 4 post lube rack (back bays); all lubrication equipment; all floor drains, lights, overhead air reels, and all overhead doors in service department; oil separator; all infrared heaters; heaters in office & showroom; and all restrooms.

[11] *Id.* at 5.  The items at the Wasilla location marked as "good - no problems" included: fifth bay (front); in ground lifts on back bays, including 3 RV racks; all lubricated equipment; all floor drains, lights, overhead air reels, and all overhead doors in service department; oil separator; all other Infrared heaters (other than one in NE corner); heaters in office and shower; air compressor; and all rest rooms except women's break room.

6

**B.     JMJ Properties Demands Access in Early February 2016.**

Under the terms of the Stipulated Order, the debtor was to vacate the Wasilla and Eagle

River properties by February 29, 2016 "or earlier with the agreement of the Lessors."[12]   The

evidence reflects that the debtor had ceased its business operations at both premises by the end

of January, but had a few employees at both locations in early February to remove the debtor's

property and prepare the premises for surrender.   An email exchange was initiated between Mr.

Crowther, counsel for JMJ Properties, and the debtor's counsel, Mr. Bundy, on February 3, 2016,

regarding this transition.[13]   Mr. Crowther noted that the debtor had closed both stores, and

requested assurances that the properties would remain insured, with the utilities on, through

February 29.   He also asked what type of arrangements the debtor had made to ensure the

security of both locations, and indicated that JMJ would like to have keys to the properties so

its agents could start repairs and it could show the locations to prospective buyers or tenants.

Mr. Bundy responded that the utilities were still on, insurance was in place, and employees were

still working at both locations.[14]   He further indicated that the debtor would need about two

weeks before it could let JMJ Properties in to show the premises or start work on the properties.

The next day, Thursday, February 4, Mr. Crowther responded that the Stipulated Order

authorized JMJ Properties to have access to the leased premises on reasonable notice, provided

its activities would not interrupt the debtor's business operations.   JMJ Properties took the

position that, "because both locations are now closed, . . . there are no business operations to

interrupt."[15]   Mr. Crowther advised that his client was not willing to wait two weeks to have

---

[12] Stipulated Order, ECF No. 203 at 1.

[13] *See* Ex. B to Mem. in Supp. of Mot. for Allowance and Payment of Admin. Claim., ECF No. 256-2
at 9-10.

[14] *Id.* at 9.

[15] *Id.*

7

access to the properties, and that it wanted access "on Monday."[16]

Mr. Bundy responded the same day.  His email stated that such early access would be "too inconvenient [for the debtor] and would interrupt the moving process (which is still 'business' I would think),"[17] but indicated that the following Monday would work for the debtor. Mr. Crowther replied on Friday, February 5, that Monday the 15th "was not acceptable."[18]  He advised that JMJ Properties had sent someone to check on both of the leased locations earlier in the month, who found no one at either location.  Mr. Crowther closed by advising that if his client could not have access by Monday, February 8, he would prepare a motion to enforce the terms of the Stipulated Order and request a hearing on shortened time.

### C.    JMJ Properties Gains Access, and the Debtor Moves Out.

Ultimately, the debtor agreed to give JMJ Properties the keys to both properties on February 9, 2016.[19]  However, the debtor hadn't yet completely moved from either location by that time.  Its owner, Mr. Gaede, testified that he was reluctant to give JMJ Properties immediate access to the premises in early February because the debtor wanted an uninterrupted period of time to move out and clean up the properties, and believed it would take more than five days to accomplish this.  He conceded that the debtor had ceased doing business by early February, but said there was still lots of work to be done at both locations before the leases expired at the end of the month.  He also testified that both locations required an extensive amount of cleaning, because the tire business had been operating in those locations for more than a decade before the debtor had "inherited them," and a large amount of equipment and aged items were still "laying around."

---

[16] *Id.*  The court presumes Mr. Crowther was referencing Monday, February 8, 2016.

[17] Ex. B to Mem. in Supp. of Mot. for Allowance and Payment of Admin. Claim., ECF No. 256-2 at 8.

[18] *Id.*

[19] *Id.* at 1.

In spite of Mr. Gaede's assertion as to the amount of work required to move the debtor out and clean up the two locations, the debtor seems to have assigned a minimal number of employees to accomplish this task.  Mr. Gaede testified that he last visited the properties on February 9.  His recollection was that the debtor had at least one employee at one of the two locations during workday hours between February 8 and 14, and perhaps one or two employees for about four hours total working between the two locations from February 15 and 21.  He testified that none of the debtor's employees were at either location after February 22, 2016.

One of the debtor's managers, Michael Hegler, was assigned to oversee the moves from both locations on February 8.  Mr. Hegler testified that he spent most of each day, for about 7 to 10 days, at either the Eagle River or Wasilla shops, or in transit between the two locations. He also said he had a couple of guys to help move equipment.  Yet, Mr. Hegler testified that the Wasilla shop was left "impeccably clean" when the debtor completed its move from that location.  He stated that the Eagle River shop was in "fair" condition by the time the debtor finished that move.

After JMJ Properties acquired the keys to the leased properties, various businesses and individuals entered both locations in early February on its behalf, while the debtor was still in the process of moving.  Mr. Williamson testified that he saw the interiors of both stores on February 11 and at various times thereafter.  He compiled a selection of "before" and "after" photographs for each location, to reflect how conditions had changed at both properties since his earlier inspection in December 2015.[20]  Mr. Williamson testified that when he saw the properties in early February, both premises were "trashed."  In the Eagle River store, he said it looked like people had thrown lockers off the mezzanine level onto the ground floor, and it also appeared that a fire extinguisher had been smashed and its contents were sprayed all over the floor.  At

---

[20] The "after" photographs were not taken by Mr. Williamson personally, but JMJ Properties established a chain of custody for them during the hearing, and Mr. Williamson's affidavit, with the "before" and "after" photographs was admitted into evidence as JMJ Properties' Exhibit L.

both locations, the towel and soap dispensers, toilet paper holders, and on-wall trash receptacles had been removed.[21] The showroom floors had debris and tire markings on them. At the Wasilla location, used oil filters had been left behind. Lead weights and mud plugged the floor drains at the Eagle River site.

JMJ Properties had B&B visit both properties to inspect, and then repair, various items. At the Wasilla location, B&B also performed a general clean-up, and reassembled tire racks and shelving that the debtor's employees had erroneously disassembled and prepared to move.[22] Its clean up activities started in February, before the debtor had vacated the Wasilla shop. In March, after the debtor had vacated the premises, CRL Services inspected the HVAC system and plumbing fixtures at the Wasilla shop, installed a blower assembly for a radiant tube heater in the southeast corner of the shop, and replaced a "Chicago faucet" in the women's restroom.

At the Eagle River location, Jerry Fernandez, on behalf of JMJ Properties, performed a comprehensive clean-up of the property, including the washing of all walls and windows, inside and out, and painted the walls and ceiling tiles. Mr. Fernandez started this work in February, but left the site after some of his tools went missing. After this occurred, he was instructed by JMJ Properties to wait until after March 1 to finish the work. B&B performed repair work at this location as well. Additionally, Isaac's Pumping Services visited the Eagle River shop three times in March 2016 to pump out the floor drains, a separator, and all sink lines. Further, CRL Services, LLC performed extensive work on the HVAC equipment at the Eagle River location

---

[21] Mr. Gaede testified that the bathroom fixtures had been installed by, and belonged to, ALSCO. He also said these fixtures were "in pretty rough" condition, and that the debtor probably threw them away after they were removed. Because the debtor concedes the amounts claimed by JMJ Properties for replacement of these fixtures, its actions regarding these fixtures will not be discussed further.

[22] At the evidentiary hearing, Mr. Gaede testified that the debtor had replaced the racking and shelving at the Wasilla store sometime in 2006 or 2007, so he believed these items belonged to the debtor rather than JMJ Properties. However, he could not produce invoices or any other evidence to support this assertion. Mr. Gaede conceded that the Stipulated Order required the debtor to leave these items in place, and acknowledged that their disassembly violated the order. The debtor's manager, Michael Hegler, testified that he didn't think the debtor's employees were aware of the terms of the Stipulated Order when they disassembled these items.

10

in March 2016.  Its work proposal, dated March 20, 2016, states that a "condition found" survey

was done on all the HVAC equipment, and estimated that the following work needed to be done

for a total of $6,500.00:

> Equipment inspection and replacement of two 20x25x2 in the
> rooftop unit, two 10″ storm caps, four thermostats, one igniter, one
> tube reflector hanger, 10′ burner tube, one burner gasket, one tube
> coupling assembly, 4ft of galvanized exhaust pipe, 6ft of 8″ of
> galvanized exhaust pipe, miscellaneous materials, labor, freight,
> man lift rental, system startups and operational checks and CRL's
> one-year craftsmanship warranty.[23]

B&B's owner, Mr. Carr, testified that the condition of both properties was "filthy" when

his business first obtained access in early February.  His grandson, William Martin, who

performed work for B&B at the Wasilla location, used the same adjective in describing the

condition of that property, as did Jerry Fernandez, who cleaned up the Eagle River store.

However, the debtor notes that these individuals were describing the condition of the properties

in early February, before it had moved all of its assets out of the two buildings and finished  its

own clean up.

The debtor's manager, Mr. Hegler, testified that he observed Mr. Johnson at both the

Eagle River and Wasilla locations, along with others who were there at JMJ Properties' request,

while he was there supervising the debtor's move.  Mr. Hegler testified that B&B started a

general clean up of the showroom and bathrooms at the Wasilla location in February, at the same

time that he was trying to move the debtor's equipment out.  He further stated that B&B used

the debtor's forklift, with permission, for about three to four hours at the Wasilla location before

the debtor removed it from that shop.[24]  This testimony was corroborated by B&B's employee,

William Martin.

---

[23] JMJ Properties' Ex. G, at 21.

[24] Mr. Hegler says Rick Carr of B&B used the debtor's forklift to remove the Bay 12 lift in the
Wasilla shop.  *See* Hegler Dec., ECF No. 296, ¶ 9.

As already noted, Mr. Hegler contradicted JMJ Properties' proffered description of both premises, as he testified that the Wasilla store was impeccably clean when the debtor vacated it, while the Eagle River store was left in "fair" condition.  Mr. Hegler explained that it was unavoidable that some dust and debris would blow in from the large doors, even after the properties had been cleaned.  He also testified that he had asked B&B if it would like the debtor's employees to reassemble the racking and shelving at the Wasilla location, but was told that B&B would take care of it.[25]  He did acknowledge that a fire extinguisher had sprayed onto the floor of the Eagle River location, but he believed one of the debtor's employees had cleaned it up.  He also stated that the debtor's employees removed the damaged lockers from that location.  He further testified that he wasn't aware of any problems with the drains at the Eagle River shop, and that the heating in both locations worked just fine during the winter, up to the time the debtor vacated both sites.

Ultimately, the debtor vacated the leased premises prior to the February 29 deadline stated in the Stipulated Order.  Mr. Hegler's recollection was that the debtor vacated the Wasilla location by February 15, at the latest, and had moved from the Eagle River location by February 21.

### Analysis

### I.    Administrative Expense Claims Under § 365(d)(3).

11 U.S.C. § 365(d)(3) requires a chapter 11 debtor to timely perform all its obligations under the terms of an unexpired lease of nonresidential real property until such time as the lease is assumed or rejected.[26]   The Ninth Circuit interprets § 365(d)(3) as a "bright-line rule,

---

[25] B&B's owner, Rick Carr, testified that he could not remember whether he had asked the debtor to reassemble the racking and shelving.

[26] Section 365(d)(3) provides that "[t]he trustee shall timely perform all obligations of the debtor . . . arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected."  Under 11 U.S.C. § 1107(a), a chapter 11 debtor acts as a trustee, and thus must fulfill the duties imposed under § 365(d)(3).

encompassing all obligations contained in a bargained-for agreement."[27]  If a debtor ultimately rejects a nonresidential lease, "all claims arising from [its] nonperformance of a post-petition, pre-rejection lease obligation are entitled to administrative expense priority."[28]  Accordingly, any damages incurred by JMJ Properties as a consequence of the debtor's breach of the Stipulated Order shall receive priority treatment as administrative expenses pursuant to § 365(d)(3).

The bankruptcy court has broad discretion in determining the allowance and amount of an administrative claim.[29]  Because priority claims are inconsistent with the Code's policy of equality of distribution, a party's entitlement to an administrative claim is narrowly construed.[30] JMJ Properties, as the party seeking administrative priority, bears the burden of proof in establishing the amount of its claim, by a preponderance of the evidence.[31]  "Proof by the preponderance of evidence means that it is sufficient to persuade the finder of fact that the proposition is more likely true than not."[32]

## II.     JMJ Properties' Damages.

JMJ Properties initially sought more than $50,000.00 in damages from the debtor, but in its post-hearing briefing reduced its claim to $45,522.13.  The debtor argues that JMJ Properties is entitled to recover roughly one-tenth of this amount, or $4,487.43.  The components of JMJ

---

[27] *Cukierman v. Uecker (In re Cukierman)*, 265 F.3d 846, 851 (9th Cir. 2001).

[28] *K-4, Inc. v. Midway Engineered Wood Prod., Inc. (In re Treesource Ind., Inc.)*, 363 F.3d 994, 998 (9th Cir. 2004)(citing *In re Cukierman*, 265 F.3d at 851).

[29] *Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 707 (9th Cir. 1988)(citing *Matter of Baldwin-United Corp.*, 43 B.R. 443, 453 (S.D. Ohio 1984)).

[30] *See Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 667 (2006)(declining to expand § 507(a)(5) to grant priority claim status to workers' compensation carriers);  *In re First Magnus Fin. Corp.*, 390 B.R. 667, 673 (Bankr. D. Ariz. 2008), *aff'd*, 403 B.R. 659 (D. Ariz. 2009)(citing *Howard Delivery Serv.*, 547 U.S. at 667).

[31] *Siller v. Big Hill Logging and Road Bldg. Co. (In re CWS Enter., Inc.)*, 2015 WL 3651541, at *4 (B.A.P. 9th Cir. June 12, 2015)(citing *Gull Indus. v. John Mitchell, Inc. (In re Hanna)*, 168 B.R. 386, 388 (B.A.P. 9th Cir. 1994)).

[32] *United States v. Arnold and Baker Farms (In re Arnold and Baker Farms)*, 177 B.R. 648, 654 (B.A.P. 9th Cir. 1994), aff'd 85 F.3d 1415 (9th Cir.1996); *see also Kelley v. Locke ( In re Kelley)*, 300 B.R. 11, 17 (B.A.P. 9th Cir. 2003)(citing *In re Arnold and Baker*, 177 B.R. at 654); *In re Sagewood Manor Assoc. Ltd. P'ship*, 223 B.R. 756, 761 (Bankr. D. Nev. 1998)(same).

Properties' claim, and the amounts conceded by the debtor are:

| Eagle River Location: | | Original Claim | | Adjusted | | Debtor's Position |
|---|---|---|---|---|---|---|
| - General clean-up (J. Fernandez): | $ | 3,750.00 | $ | 1,250.00 | $ | - |
| - Replacing lube head, removing oil and waste (B&B): | $ | 2,000.00 | $ | 2,000.00 | $ | 500.00 |
| - Replacement of motor on compressor (B&B): | $ | 2,500.00 | $ | 2,500.00 | $ | - |
| - Rebuilding air reels (B&B): | $ | 1,200.00 | $ | 1,200.00 | $ | - |
| - Lift repairs (B&B): | $ | 650.00 | $ | 650.00 | $ | - |
| - Conex trailer (value estimated by B&B): | $ | 2,500.00 | $ | 2,500.00 | $ | - |
| - Restroom equipment (receipts provided): | $ | 208.46 | $ | 208.46 | $ | 208.46 |
| - Pumping drains (Isaac's Pumping): | $ | 2,970.00 | $ | 2,970.00 | $ | - |
| - Heating system work (CRL Serv.): | $ | 6,137.48 | $ | 6,137.00 | $ | - |
| TOTAL Eagle River: | **$** | **21,915.94** | **$** | **19,415.46** | **$** | **708.46** |
| | | | | | | |
| Wasilla Location: | | | | | | |
| - General clean-up (B&B): | $ | 5,865.00 | $ | 1,955.00 | $ | - |
| - Reassembly of tire racks and shelving (B&B): | $ | 5,000.00 | $ | 5,000.00 | $ | 1,500.00 |
| - Alignment rack (B&B): | $ | 5,000.00 | $ | 5,000.00 | $ | 1,000.00 |
| - Repair Bay 7 lift (B&B): | $ | 875.00 | $ | 875.00 | $ | - |
| - Repair Back Bay lift (B&B): | $ | 5,000.00 | $ | 5,000.00 | $ | - |
| - Heads on RV rack (B&B): | $ | 1,500.00 | $ | 1,500.00 | $ | - |
| - Hose reels (B&B): | $ | 1,000.00 | $ | 1,000.00 | $ | - |
| - Lube dispensing head (B&B): | $ | 1,000.00 | $ | 1,000.00 | $ | - |
| - Lube pits (B&B): | $ | 2,460.00 | $ | 2,460.00 | $ | 500.00 |
| - Bathroom equipment (receipts provided): | $ | 778.97 | $ | 778.97 | $ | 778.97 |
| - Blower assembly, faucet replacement (CRL Serv.): | $ | 1,537.70 | $ | 1,537.70 | $ | - |
| TOTAL Wasilla: | **$** | **30,016.67** | **$** | **26,106.67** | **$** | **3,778.97** |
| | | | | | | |
| **TOTAL Claimed:** | **$** | **51,932.61** | **$** | **45,522.13** | **$** | **4,487.43** |

## III.    JMJ Properties' Administrative Claim is Defined by the Stipulated Order.

The debtor's leases for the Eagle River and Wasilla properties both required that it "maintain, repair, service, [and] replace . . . plumbing, in-ground hydraulic lifts, waste oil burner, oil separator, bulk oil storage tanks, electrical, [and] heating/ventilation . . . in as good condition as now exists," and to surrender such items on expiration of the leases "in the same condition as received, ordinary wear and tear excepted."[33]   However, the Stipulated Order provided that JMJ Properties would only have administrative claims in this bankruptcy case to the extent such

---

[33] JMJ Properties' Exs. B and C, at 4.

14

claims arose "from events after December 8, 2015 or for breach of this agreement."[34]  It further required that funds be placed on deposit in the trust account of debtor's counsel "as security to reimburse the Lessors for any damages to the leased premises occurring between the date of this stipulation and February 29, 2016 for which the debtor would be liable under the terms of the Leases."[35]

Both parties interpret the Stipulated Order to require that JMJ Properties "show that the loss or damage [it seeks] to be compensated for occurred between December 8, 2015 and February 29, 2016 and is the result of a breach by the Debtor of one or more of the underlying agreements between the parties."[36]  The debtor argues that almost all of the components of JMJ Properties' claim do not meet this test, because there is no proof that the damages occurred within this window, or were necessitated by other than normal wear and tear.  The debtor also contends may of the components of JMJ Properties' claim are overstated.

## IV.  JMJ Properties' Reliance on the Property Condition Summaries as Proof of Damages.

To establish that its claimed damages occurred within the "administrative claim window" of December 8, 2015 to February 29, 2016, JMJ Properties relies on the typed summaries prepared by Mr. Williamson after he and Mr. Johnson inspected the Wasilla and Eagle River properties on December 11, 2015.  In a nutshell, its argument is that its claimed expenses for repairs correlate to items that were marked "good - no problem" as of the date of the inspection, and therefore the repairs were due to issues arising between December 11 2015, and the date the JMJ Properties retook possession of the two locations.

---

[34] Stipulated Order, ECF No. 203 at 3, ¶ 7.

[35] *Id.* at 3, ¶ 6.

[36] JMJ Properties' Post-Trial Reply Mem., ECF No. 349 at 2.  *See also* Debtor's Closing Argument in Opp'n to Claim for Admin. Expense, ECF No. 340 at 1 ("In order to recover, the landlords need to show that any loss or damage took place in the December - February period [and] also need to show that any claim is for loss or damage for which the Debtor would otherwise be liable under the terms of the leases.").

The debtor challenges the veracity of the summaries.  It contends the two inspections were only superficial "walk throughs" that lasted about an hour at each location, and none of the equipment was actually tested or inspected.  It notes that no one signed the inspection summaries on behalf of the debtor, and asserts the summaries cannot be considered an admission on the debtor's part.  It further argues that some of the repair work may have been due to either normal wear and tear, not recoverable under the leases or Stipulated Order, or JMJ Properties' desire to bring the properties back to "showroom" or "turnkey" condition to attract a new tenant or buyer.

JMJ Properties asserts the summaries are admissible as summaries of statements made by the debtor's employees under Fed. R. Evid. 801(d)(2),[37] and they do appear to satisfy the requirements of this rule.  Mr. Williamson's testimony was that he took contemporaneous, handwritten notes of statements made by the debtor's on-site managers, Brent Page at the Wasilla location and Jake Sharek at the Eagle River location, when he and Mr. Johnson toured both locations.  He further testified that the managers walked around the premises with him and Mr. Johnson, and were asked about the condition of specific items of equipment.  He wrote down their answers, and within the week, compiled his typewritten summaries based on his handwritten notes.

The summaries do provide some evidence of the condition of the two leased properties as of December 11, 2015.  However, the  brief notes cannot be stretched to mean more than they say.  For example, the Wasilla summary notes that the "first four bays (front)" had problems, per B&B, but the fifth bay was "good - no problems."[38]  It also notes that the "in ground lifts on back

---

[37] *See* JMJ Properties' Post Trial Reply Mem., ECF No. 349 at 2-4.  Fed. R. Evid. 801(d)(2) makes an exception to the hearsay rule for a written or oral assertion offered against an opposing party that was:

    (A) made by the party in an individual or representative capacity;
    (B) is one the party manifested that it adopted or believed to be true;
    (C) was made by a person whom the party authorized to make a statement
    on the subject; [and]
    (D) was made by the party's agent or employee on a matter within the scope
    of that relationship and while it existed[.]

[38] JMJ Properties' Ex. L, at 5.

bays, including 3 RV racks" were "good - no problems."[39]  Based on the summary, JMJ seeks to recover B&B's charges to repair a "Bay 7 lift because it doesn't go down ($875.00)."  But the Wasilla summary doesn't mention any lifts by number.  The court is not familiar with either of the properties.  By comparing the summary to the floor plan sketch of the Wasilla property, it assumes the Bay 7 lift is a front bay lift.[40]  However, the summary only references 5 front bays (the first four having problems and the fifth one marked "good"), so it is unclear how this reference corresponds to the Bay 7 lift.  Further, there was no testimony that B&B's employees discovered a non-functional lift stuck in the raised position when they first accessed the Wasilla shop in February.  It seems this would have been fairly obvious; yet, none of the photographs introduced by JMJ Properties show a lift in this condition.

There was also testimony that refuted some of the condition statements set out in the summaries.  The most glaring example is the notation in the Wasilla summary that all of the back bay lifts, including 3 RV racks, were "good - no problem."  The veracity of this particular notation is refuted by other evidence regarding the RV racks.  JMJ Properties seeks to recover $1,500.00 to replace heads on an RV rack at the Wasilla shop.  Yet, testimony at the evidentiary hearing established that an RV rack in the Wasilla shop had not been used for more than a year.  Mr. Carr testified that B&B discovered "a rack that had been covered by palleting, every time that we'd been out there over the years, that we discovered was inoperable."  He further stated, "We were under the impression that everything was working, but it wasn't."  The debtor's manager, Mr. Hegler, also discussed the RV rack.  He testified that the heads on the RV rack in the Wasilla shop had been removed more than a year ago, to make that space available for storage.  This testimony wholly refutes JMJ Properties' contention that the RV rack was damaged during the administrative claim window.

---

[39] *Id.*

[40] Floor plan sketches for the Wasilla and Eagle River properties are included as the final pages of Exs. 1 and 2 to the Aff. of Rick Carr, ECF No. 272.

JMJ Properties must prove its administrative claim by a preponderance of the evidence. Given the generality of the summaries, and the contradictory evidence in the record, the court is unwilling to find that summaries conclusively establish the condition of both premises as of the date of the Stipulated Order. The evident animosity between the parties manifested through the witnesses' testimony also weighs heavily against reliance upon the summaries as dispositive proof.

## V.    Issues with B&B's Statements and Invoices.

The debtor contends JMJ Properties has overstated its administrative claim. The bulk of JMJ Properties' claim is based on statements submitted by B&B. Those statements have been introduced with JMJ Properties' Exhibits G, H, I and J. The amount listed for each job on the statement is a nicely rounded number, generally ranging from $1,000.00 to $5,865.00. None of the charges are supported by an itemization showing the hours worked or pay rates for B&B's employees, nor are the costs for the parts included in the repair work listed. While B&B also prepared invoices upon its completion of specific jobs, these are even more general than its statements. For example, with respect to the Wasilla property, B&B's statement reads, "Reassembling all tire racks in mezzanine area & reassembling and shelving in parts room," for an estimated charge of $5,400.00.[41] No additional information for this work can be gleaned from its final invoice, which simply lists "tire rack & parts racking reinstall & area clean-up" for a final cost of $5,000.00.[42]

B&B's owner, Mr. Carr, testified that the price of a job was calculated and billed by using "x number of people on the job for x number of hours at a certain rate." However, he said he no longer had any of the calculations or other records he used to determine the estimates on his statements or the amounts on his final invoices. He recalled that B&B had three to five

---

[41] JMJ Properties Exs. H, at 2, J at 1.

[42] JMJ Properties' Ex. H, at 4.

18

employees working at the Wasilla location, depending on what needed to be done that day, but he had no time sheets or other records to substantiate this. He said B&B hired "day laborers," at rates ranging from $15.00 to $30.00 per hour. His two highest paid employees were his grandsons. His own hourly rate was $125.00.

Mr. Carr estimated that his employees worked 14 full days at the Wasilla location. He also stated that the employees billed two hours of travel time each day, for their round-trip drive from Anchorage to Wasilla. Thus, each employee was, presumably, compensated for ten hour days. However, his grandson, Mr. Martin, testified that he and the other employees worked "mostly" full time, and did not mention being paid for travel time. Mr. Martin further stated that he did not keep time cards.

B&B's statements also indicate that parts were installed or are on order. But again, neither the statements nor B&B's invoices itemize the cost for the parts, or even identify which parts are on order.

More problematic, Mr. Carr testified that he was unaware of the condition of either shop as of December 2015. He said he had inspected both locations earlier, in September 2015, and there were things wrong in September that were still wrong in February. As examples, he stated that there was a compressor in Eagle River that still needed to be dealt with, as well as a couple of items in Wasilla. But anything that was "wrong" in September 2015, and that required repair, would not be encompassed by the terms of the Stipulated Order.

Mr. Carr testified that the March statements were prepared because JMJ Properties wanted to get the locations in shape to show or release, essentially in turnkey condition. He said he listed only "new" items on the March statements, but that he was "a little confused" with this. He said Mr. Johnson had told him to ignore anything that had been on prior estimates, but that "we needed to get everything else up and corrected. Anything that was new had to be noted and taken care of." This testimony sheds no light on whether the repairs shown on B&B's statements were attributable to damage within the administrative window period, normal wear and tear, or

19

JMJ Properties' wish to upgrade the properties to showroom condition.

Further, Mr. Carr said the additional work he felt needed to be done depended on what happened with the buildings. He explained that "nobody knows what's gonna happen to the properties . . . whether they'll go back out under automotive or somebody would take them and turn them into a warehouse and you'd have to remove everything." This testimony compels a question; if JMJ Properties doesn't yet know how the Wasilla and Eagle River locations will have to be configured for new tenants, who may use the properties for a different purpose than an auto shop, why did it include in its administrative claim work that at this point is only an estimate and may ultimately be unnecessary?

Because of these issues, the court will exercise its discretion to determine the allowable amount for the various components of JMJ Properties' claim, as more specifically discussed below.

## VI.   The Components of JMJ Properties' Administrative Claim.

### A.     Charges to Clean Up the Wasilla and Eagle River Locations.

JMJ Properties initially sought allowance of $3,750.00 for the cleanup of the Eagle River location and $5,865.00 for cleanup of the Wasilla shop. The evidence reflects that, at both locations, its agents B&B and Mr. Fernandez performed a deep clean, scrubbing and refinishing floors, power-washing walls, and washing windows inside and out. This goes well beyond the Stipulated Order's requirement that the premises be left "broom-clean." However, JMJ Properties has substantially reduced its claim for cleaning. It now seeks $1,250.00 for the Eagle River shop and $1,955.00 for Wasilla.

The debtor argues that there is no evidence any cleaning was needed at either location as of the dates it vacated the two shops. Its manager, Mr. Hegler, testified that the debtor left the Wasilla property "immaculately clean," and the Eagle River shop in "fair" condition. He also said he "believed" the debtor's employees had cleaned up the damaged fire extinguisher and its residue from the Eagle River shop. However, the evidence reflects that the debtor tasked very

20

few employees to move its assets from and clean up the two locations, and that these employees spent a portion of their time running a "Craig's list" sale of surplus equipment, before leaving the premises early. Based upon the testimony presented, the court finds that the limited number of employees working on the move for the debtor could not have satisfactorily brought either of the shops to "broom clean" condition. The court will allow the reduced charges for cleaning sought by JMJ Properties.

### B.    Reassembly of Shelving and Racking at Wasilla Shop.

Although JMJ Properties reduced its claim for cleaning the Wasilla shop, it has not made a similar adjustment to its charge for reassembly of the racking and shelving. Mr. Carr testified that it took three employees three days to move and reassemble the shelving and tire racking in the Wasilla Shop. When asked about B&B's estimated charge of $5,400.00 to perform this task, he conceded that this worked out to an overall cost of about $60.00 an hour. B&B's final bill for this task was just under its estimate, an even $5,000.00.

Mr. Carr's grandson, Mr. Martin, personally worked on this project. He testified that he and his brother, along with one other employee, required three days to reassemble the shelving and racking. He said he and his brother spent three hours moving the tire racking from the ground floor back to the mezzanine level, and that he, his brother, and one other employee spent the remainder of three days reassembling all the shelving and racking. Mr. Martin testified that he was paid $30.00 per hour; his brother was paid $20.00 per hour, and the other employee received $15.00 per hour. He said he did not keep time cards.[43] Thus, B&B's overall hourly rate for three "day laborers" to move and reassemble the shelving and racks at the Wasilla shop was $65.00.

The shelving and racking job required unskilled labor. The debtor's manager, who has personally assembled such items, testified that he wouldn't pay an employee more than $10.00

---

[43] Mr. Martin also stated that he, his brother, and another employee performed the general clean up at the Wasilla location for B&B, and were paid at the same rates.

to $15.00 to do this job.  The debtor concedes it was at fault for disassembling and moving the shelving and racking, but suggests this portion of JMJ Properties' claim should be reduced to $1,500.00.

The court finds that the $5,000.00 charged by B&B for this task is unreasonable and overstated.  It will reduce this portion of JMJ Properties' claim to $1,500.00, as proposed by the debtor.[44]

### C.      B&B's Charge for Repair of the Alignment Rack.

B&B charged $5,000.00 for repair of a Hunter alignment rack at the Wasilla shop.  The evidence reflects that the lines to this piece of equipment had been cut, and the rack itself had been moved.  This was discovered by JMJ Properties when it first accessed the Wasilla shop in early February, and the debtor gave no plausible explanation for why the rack was found in this condition.

B&B's invoice and statement offer no details as to how many man-hours were required to repair the alignment rack.  Its invoice simply says, "RL rack reinstall - $5,000.00."[45]  Its statement amplifies the job description somewhat, listing "[r]einstallation of RL alignment rack, replace hydraulic, air & electrical lines, main & communication cables, . . . also repair console."[46]  There was no specific testimony regarding the amount of time required to repair this piece of equipment.  Mr. Martin testified that he installed the alignment rack, but gave no estimate of his time.  He said the repair work was complicated because the lines had been cut, the runways holding the jacks were bent and had to be straightened, and the console was also bent "pretty bad."  He further added that the anchors and threads had to be filed down just to get

---

[44] At the rate of $15.00 per hour, and assuming the three employees worked three full, 8-hour days, plus were compensated for the two hours of travel time between Anchorage and Wasilla, the court calculates a total charge of $1,350.00.  However, it will accept the debtor's figure for this work.

[45] JMJ Properties' Ex. H, at 4.

[46] *Id.* at 2.

22

nuts on them.  However, Mr. Martin also said that the job could have been accomplished in about 3 hours if things hadn't been cut and bent out of shape.

The debtor suggests that the allowable amount for this repair should be reduced to $1,000.00.  Again, the court agrees.  It finds that no more than one day would be required to repair the alignment rack.  Because this work requires more expertise than general clean up or reassembly of shelving and racking, a higher hourly rate is appropriate.  It is likely that the repair work would have to be coordinated between two employees.[47]  The court will allow $1,000.00 for the repair of the alignment rack.

### D.     B&B's Repair Charges for the Wasilla Bay Lifts.

B&B's statement for its work at the Wasilla shop includes charges to repair Bay 7 lift because it doesn't go down ($875.00), and to repair Back Bay 12 double post lift (parts on order)($5,000.00).  The repair of the Bay 7 lift has been finished and paid for by JMJ Properties; the other job has not yet been completed.

The debtor challenges both charges.  It argues that the lifts were not tested when the December 2015 inspection was done, and there is no evidence that the lifts stopped working after December 8.  Its manager, Mr. Hegler, testified that he saw Mr. Carr working on the Back Bay 12 lift, but that to the best of his knowledge, both that lift and the Bay 7 lift were fully functional through the date the debtor ceased doing business at that location.  He further testified that the debtor never had need to use Bay 7, and that lift was never in the air while the debtor was operating there.

As discussed in Part IV, JMJ Properties relies on the Wasilla summary as proof that these items of equipment worked fine as of December 11 and became damaged sometime during the administrative claim window.  But Mr. Hegler's testimony as to the non-use of Bay 7 supports

---

[47] Assuming Mr. Martin ($30/hour) and his brother ($20/hour) worked a full day to repair the alignment rack, the debtor's figure of $1,000.00 would cover an 8-hour work day, plus two hours of travel time.

23

the finding that the damage to this particular lift may have occurred well outside the administrative claim window.  This lift was not tested during the December 11 inspection, and Mr. Carr's testimony about the back bay equipment suggests that B&B may have been unaware of the true condition of the lift on that date as well.[48]  The court concludes that JMJ Properties has not met its burden of proof as to the charges related to the Bay 7 lift in light of Mr. Hegler's testimony and generalized descriptions listed in the Wasilla summary.  Therefore, the court will deny the $875.00 charge claimed by JMJ Properties for this item.

As for the Back Bay 12 lift, the Wasilla summary noted that all of the lifts on the back bay were in good condition.  The more specific evidence is that Mr. Carr inspected this lift on February 13, and used the debtor's forklift to disassemble it.[49]  B&B's estimated charge to repair the lift is presumably based on his finding at that time.

At the evidentiary hearing, Mr. Hegler testified that the lift was fully functional, as far as he knew, before Mr. Carr started to take it apart.  Mr. Martin's grandson also testified regarding this lift.  He said he located the Bay 12 lift head in the Wasilla shop, and also testified that he opened up the inspection plate for that bay and found oil underneath.[50]  JMJ Property offers an "after" photograph of this lift, but it is dated March 28, 2016, well after the debtor vacated the Wasilla shop.[51]

Based on the fact that Mr. Carr inspected the Bay 12 lift on February 13, the court concludes that the repairs to that item of equipment are due to damage caused within the administrative window period.  However, B&B's charge for this item is an estimate.  Because

---

[48] As discussed in Part IV, Mr. Carr's testimony was, "We were under the impression that everything was working, but it wasn't."

[49] *See* Debtor's Opp'n to Claim for Admin. Expenses, ECF No. 295 at 4; Hegler Decl., ECF No. 296, ¶¶ 2, 9.

[50] The accumulation of oil could be attributable to normal wear and tear, which is not recoverable as an administrative expense, rather than damage to equipment.

[51] *See* Ex. C to Williamson Aff., ECF No. 271-3 at 12 (also introduced as JMJ Properties' Ex. L).

24

no breakdown of the estimated man hours or actual parts costs has been provided, the court will allow half of the total estimated repair cost, or $2,500.00.

### E.    B&B's Charges to Replace Heads on RV Rack at Wasilla Shop.

Another challenged item on B&B's statement is its estimated charge of $1,500.00 to "reinstall two & replace one head on RV rack (parts on order)." JMJ Properties again relies on the Wasilla summary to support its contention that the RV rack was damaged during the administrative claim window. As discussed in Part IV, the testimony of both Mr. Carr and Mr. Hegler wholly refutes this inference.[52] The estimated charge for reinstallation and repair of the RV rack heads is denied.

### F.    Charges for Hose Reels and the Lube Dispensing Head at Wasilla Shop.

The debtor also challenges B&B's estimated charges to "replace & install two hose reels and reinstall one hose reel (need to rent lifting equipment to reach ceiling)(parts on order)" for $1,000.00, and to "replace one lube dispensing head on lubrication equipment (parts on order)," also for $1,000.00. JMJ Properties again relies on the Wasilla summary prepared by Mr. Williamson to establish the timing of the damage to these items. The summary indicated that the air compressors, air reels, and all "lubricated equipment" were in good condition as of early December. JMJ Properties does provide an "after" photograph of the lube dispensing head, but it is undated.[53]

The debtor's manager, Mr. Hegler, testified that, to the best of his knowledge, these items were all working up to the date the debtor vacated the Wasilla shop, although he conceded he didn't see them in use. With reference to the lube dispensing head, he testified that this was a

---

[52] Mr. Carr testified that B&B discovered "a rack that had been covered by palleting; every time that we'd been out there over the years, that we discovered was inoperable." He further stated, "we were under the impression that everything was working, but it wasn't." The testimony of the debtor's manager, Mr. Hegler, was consistent with Mr. Carr's. He testified that the heads on the RV rack in the Wasilla shop had been removed more than a year ago, to make that space available for storage.

[53] Ex. C to Williamson Aff., ECF No. 271-3 at 8 (also introduced as JMJ Properties' Ex. L).

quick-fit connection that takes seconds to put on, and his research indicated that a new lube dispensing head would cost about $270.00.

Mr. Hegler's testimony regarding the condition of these items was not based on his personal knowledge. On the other hand, B&B's estimated repair charges are based on Mr. Carr's inspection of these items either in mid-February or early March, after the debtor had vacated the premises. The replacement of a missing lube head, and the reinstallation of a hose reel, would both constitute equipment damage, rather than normal wear and tear. The same cannot be said with respect to the installation of two new hose reels; these charges may reflect an upgrade rather than repair. B&B's estimates for both charges are, again, unitemized estimates, with "parts on order." The estimate for the hose reels indicates that lifting equipment will have to be rented to reach the ceiling. The court will allow $500.00 for replacement of the lube dispensing head, and $875.00 for the hose reels.

### G.     The Lube Pit at the Wasilla Location.

The evidence reflects that the debtor failed to remove roughly 60 used oil filters from a lube pit at the Wasilla shop. B&B's statement describes the work performed for this task as, "Lube pits: clean thoroughly with degreaser to remove all oil & grease residue, crush approximately 60 oil filters left & remove all used oil & hazardous waste."[54] Its estimated cost for this job was $1,500.00, but its invoice increased the cost for the completed work to $2,460.00.[55] The invoice does not expand on the job description, nor does it explain why the final bill was substantially more than estimated.

The debtor's manager, Mr. Hegler, testified that B&B's charge was overstated, because this job simply required an employee to pick up the 60 used filters and put them into a large garbage bag. However, Mr. Martin, who was personally involved in this task, testified that the

---

[54] JMJ Properties' Exs. H, at 3, J, at 2.

[55] JMJ Properties' Ex. H, at 4.

26

lube pit itself was unsafe, because the grates were coated with oil and very slippery.  He testified that the grates had to be cleaned before the pit could be accessed, and that everything in the pit, including the pumps and walls, had to be sprayed with brake clean and scrubbed.  He said it took three people a full day to get the job done.

The debtor suggests that $500.00 is a more appropriate charge than $2,400.00 for this work.  The court agrees that the B&B's charge for this work is overstated.  Assuming Mr. Martin, his brother, and one other "day laborer" worked on this job for a full day, including two hours of travel time, at a collective hourly rate of $65.00,[56] the court will award labor costs of $650.00 for this task.  No waste disposal costs will be allowed, because no independent evidence was offered on this point.

### H.    Blower Assembly and Faucet Repair at Wasilla Shop.

The final two items on B&B's Wasilla statement are for charges to repair the blower assembly in a heater, and to replace a faucet in the women's restroom.  This work was actually performed by CRL Services, LLC ("CRL"), for a cost of $1,537.70.  CRL's estimate and itemized invoice are included with JMJ Properties' Exhibit H.  This job involved a lift rental ($391.17), and material ($144.03), plus a preferred customer rate ($937.50), expeditor ST rate ($30.00), and a vehicle trip charge($35.00).  An email from CRL is also included in Exhibit H, which explains that these repair costs "were not previously condemned" by Brent Page, the manager for the Wasilla shop, or by CRL, until its most recent inspection.[57]

The Wasilla summary reflects that all heaters were in good condition, no problems, in

---

[56] According to Mr. Martin's testimony, he was paid $30.00 per hour, his brother received $20.00 per hour, and other workers were paid $15.00 per hour.

[57] JMJ Properties did try to segregate out CRL's charges.  CRL's March 3, 2016 email to JMJ Properties reflects that one of the other tube heaters had been "previously condemned by Brent Page and shut off during one of CRL's previous visits," and that a blower fan had been "previously condemned by Brent Page but unknown to CRL Services until our most recent inspection."  These repairs were estimated to cost $2,795.00 and $650.00, respectively.  *See* JMJ Properties' Ex. H, at 9.  These items were not included as part of JMJ Properties' claim.  However, CRL doesn't say when its earlier inspection took place; if it was earlier than December 8, the "new" damages could have also occurred sooner than that date.

27

early December.  The debtor's manager, Mr. Hegler, testified that the heat in both locations worked just fine while he was working on the debtor's move out in February.[58]  The debtor argues this charge should be denied because there is no evidence to explain why this work was needed.

With respect to the replacement of the faucet in the women's restroom, the Wasilla summary reported that restrooms were in good condition, with the exception of the women's break room.  The debtor notes there is no photograph showing that there was a damaged faucet in the women's restroom in February, when B&B first accessed the Wasilla shop, and suggests the new faucet was an upgrade rather than a repair.

Given the state of the evidence, the court finds that JMJ Properties has not met its burden of proof as to the charges billed by CRL.  Because it is unknown when CRL's earlier inspection of the heating equipment occurred, JMJ Properties has not established that the issues with the blower or the faucet arose during the administrative claim window of December 8, 2015 and February 29, 2016.  Additionally, particularly with respect to the faucet, there is no evidence to establish that the conditions repaired were attributable to damage caused by the debtor, rather than normal wear and tear.  For these reasons, these charges are not allowable as an administrative claim.

### I.    Replacing Lube Head and Removing Oil and Waste at Eagle River Shop.

B&B's Eagle River statement lists a charge of $2,000.00 to "replace one lube dispensing head on lubrication equipment (parts & labor), remove all hazardous waste."[59]  B&B has completed this job.  Its invoice describes the work as "clean & function test lube center - remove all hazardous waste."[60]  JMJ Properties has paid for this charge in full.

---

[58] Further, none of JMJ Properties' witnesses complained that either property was cold while they worked there in February, nor mentioned issues with the heating system.

[59] JMJ Properties' Exs. G, at 2, I, at 1.  This charge was reduced from $3,500.00.

[60] JMJ Properties' Ex. G, at 9.

Mr. Williamson's Eagle River summary indicated that all lubrication equipment was in good condition as of December 11, 2015. The debtor argues that there is no evidence that a lube dispensing head went missing anytime after that date.[61] Its manager, Mr. Hegler, testified that a lube head would cost about $270.00. The debtor also contends a charge of $2,000.00 for removal of hazardous waste is excessive, because it encompasses essentially trash disposal. It suggests this portion of JMJ Properties' claim should be allowed in a reduced sum, not to exceed $500.00.

The court will allow this claim in the amount of $500.00, plus the sum of $151.22, for a total of $651.22. This additional amount is drawn from the March 4, 2016 invoice to JMJ Properties from Alaska Tire & Rim for two hours of labor and a landfill charge for dropping off 1,760 pounds of waste.[62] The evidence does not support allowance of a greater amount.[63]

### J.      Replacement of Motor on Compressor at Eagle River Shop.

B&B's Eagle River statement includes an estimate of $2,500.00 to "replace one electric motor on air compressor (parts & labor), parts on order."[64] The debtor argues that the air compressor worked all winter, and that there was no evidence as to why the motor needed to be replaced. Mr. Hegler testified that the air compressor had to have worked, because it was the only one in the Eagle River shop. The debtor suggests this charge is intended as an upgrade for a new tenant, rather than on account of damage between December 2015 and February 2016.

To support this portion of its claim, JMJ Properties relies on the Eagle River summary, which noted that the compressor was in good condition in December, and the fact that B&B has

---

[61] The debtor's manager, Mr. Hegler, testified that the debtor's employees at the Eagle River store didn't use lube dispensing heads; instead, they bought bulk oil by the barrel, which they hand pumped directly into a jug that was then poured into vehicle. He said that they had done this since before December, so the condition of the lube dispensing head would not have changed during the administrative claim window.

[62] JMJ Properties' Ex. G, at 6-8.

[63] Cleaning and function testing a lube center would seem to address normal wear and tear.

[64] JMJ Properties' Ex. G, at 2.

billed it for this work.  B&B's charge is an estimate, which again lacks any detail regarding the number of manhours required, or the actual cost of the compressor.  Further, Mr. Carr testified that "we still have a compressor in Eagle River that we have to deal with," and indicated that this was one of the jobs that might not get done, depending on what happened to the properties.

Weighing the evidence on this item, the court denies the charge to replace the motor on the air compressor.

### K.    Rebuilding Overhead Air Reels in Eagle River Shop.

B&B's Eagle River statement lists a charge of $1,200.00 to "rebuild 4 overhead air reels, parts on order."[65]  The debtor challenges this charge.  It notes there are no photographs of these items, nor is there evidence that these items became damaged during the administrative claim window.  The debtor's manager, Mr. Hegler, testified that he hadn't personally used the air reels in February, but as far as he knew, they were working.

JMJ Properties relies on the Eagle River summary, which noted that all overhead air reels were "good - no problems," and the fact of B&B's statement, to support this portion of its claim.  But again, the bill is an estimate.  Further, it doesn't explain whether this work will address normal wear and tear, or actual damage, to the air reels.  For these reasons, the court will deny this charge.

### L.    Lift Repairs in Eagle River.

B&B's Eagle River statement lists an estimated charge of $650.00 for "4 post lube lift repairs to the sheave stack, parts on order."[66]  The summary of the Eagle River shop stated that the "4 post lube rack (back bays)" were in good condition as of December 11.  JMJ Properties argues that the summary, coupled with B&B's statement, justifies treating this cost as an administrative expense.

---

[65] *Id.*

[66] *Id.*

The debtor challenges this charge on the same grounds as the cost to rebuild the overhead air reels.  The court denies this charge, for the same reasons.

### M.    The Conex Trailer in Eagle River.

JMJ Properties seeks to recover the sum of $2,500.00, for a missing Conex trailer.  It has provided a photograph showing this trailer parked at the side of the Eagle River shop on December 11, and another one that shows the trailer missing from that spot on March 7, 2016. It also introduced the testimony of James Akers to establish that, when the debtor vacated another location on Dimond Boulevard, it left a Conex trailer behind.  The value of the trailer is based on an estimate by B&B.  Its Eagle River statement describes this item as a "20 foot Coner [sic] trailer, tire storage, painted blue to match building removed from property (stolen), $2,500.00."[67]

The debtor's manager, Mr. Hegler, testified that a trailer had been at the side of the Eagle River shop, but he didn't remove it.  He also said he believed that the debtor owned the trailer, and had  placed it there initially.

The trailer is not listed in the debtor's lease for the Eagle River property.  Further, it is neither a fixture nor fixed equipment, which the debtor would have been prohibited from removing under the parties' July 2008 Modification Agreement.  There is no evidence that the debtor took the trailer.  Finally, there is no evidence to substantiate B&B's estimated value for the trailer.  For all of these reasons, the claim for the trailer will be denied.

### N.    Charges for Pumping Drains at Eagle River Shop.

JMJ Properties has paid Isaacs Pumping Services a total of $2,970.00 to pump out the floor drains and separator, and to clean out the sink lines, at the Eagle River shop.[68]  The debtor

---

[67] *Id.*

[68] JMJ Properties' Ex. G, at 13-18.

31

argues that this is not recoverable as an administrative expense, because it is a routine task, necessitated by ordinary use of the property. It also notes that the pumping charges are higher than what Isaac's typically charges for this service, and suggests that JMJ Properties wanted a thorough job done so the property would show well to the next tenant.

The photographs from the Eagle River location reflect that there was a lot of debris not only on the shop floor, but underneath the metal grating of the drains. This represents damage, rather than normal wear and tear. The charges from Isaacs Pumping will be allowed.

**O.      CRL's Charges for the Eagle River Heating System.**

CRL has billed JMJ Properties $6,137.48 for work performed on the heating system at the Eagle River shop.[69] This sum included an inspection, a lift rental, and the replacement of various items, including two rooftop units, two storm caps, four thermostats, an igniter, a tube reflector hanger, burner tube components, and portions of exhaust pipe.

Aside from the Eagle River summary, which noted that all heaters were "good," and CRL's estimate and invoice, JMJ Properties offers little to explain why these charges were necessary. As discussed in Part VI.H above, the debtor's manager testified that the heating system in the Eagle River shop worked just fine until the property was vacated in February. The debtor challenges this charge. It says there is no evidence that the heating system was any worse in February than it was in December, and argues that JMJ Properties has failed to adequately explain the reason for it. The debtor suggests JMJ Properties wanted to overhaul the heating system for a new tenant.

The court agrees with the debtor as to this charge. There is no evidence to suggest that the heating was not functioning during the administrative claim period, or that the system incurred damage during that time frame. This charge will be disallowed.

---

[69] JMJ Properties' Ex. G, at 19-20.

32

**P.      The Charges for the Restroom Equipment are Uncontested.**

The debtor does not contest the portions of JMJ Properties' claim related to the replacement of equipment in the bathrooms at the two locations. These two items, $208.46 for the Eagle River location, and $778.97 for the Wasilla location, will be allowed as requested.

## Conclusion

JMJ Properties seeks to recover $45,522.13 from the debtor as an administrative claim, arguing that this sum represents its costs to clean up, and to repair damages at, the Eagle River and Wasilla shops it leased to the debtor. To be entitled to an administrative claim, JMJ Properties was required to prove that the components of its claim were due to damages to the property or equipment between December 8, 2015 and February 29, 2016, or on account of the debtor's breach of the Stipulated Agreement pertaining to its rejection of the two leases.

The debtor challenged the majority of JMJ Properties' charges. Having thoroughly reviewed the evidence presented, the court finds that JMJ Properties has failed to establish its entitlement to a large portion of its claim by the preponderance of the evidence. Its proof suffered from two major flaws, one being the generality of statements and invoices submitted to establish its repair charges, and the other being the lack of evidence as to the necessity of the repairs. As to many elements of JMJ Properties' claim, the court could not determine whether the repairs were on account of damage to equipment that occurred within the administrative expense window, constituted normal wear and tear, or resulted from a desire to bring the properties back up to "showroom" condition for its next tenant.

The court will award JMJ properties $14,838.65 as an administrative expense claim, itemized as follows:

33

| Eagle River Location: | JMJ Adjusted Claim | Debtor's Position | Amount Allowed |
|---|---|---|---|
| - General clean-up: | $ 1,250.00 | $ - | $ 1,250.00 |
| - Replacing lube head, removing oil and waste: | $ 2,000.00 | $ 500.00 | $ 651.22 |
| - Replacement of motor on compressor: | $ 2,500.00 | $ - | $ - |
| - Rebuilding air reels: | $ 1,200.00 | $ - | $ - |
| - Lift repairs: | $ 650.00 | $ - | $ - |
| - Conex trailer: | $ 2,500.00 | $ - | $ - |
| - Restroom equipment: | $ 208.46 | $ 208.46 | $ 208.46 |
| - Pumping drains: | $ 2,970.00 | $ - | $ 2,970.00 |
| - Heating system work: | $ 6,137.00 | $ - | $ - |
| TOTAL Eagle River: | $ 19,415.46 | $ 708.46 | $ 5,079.68 |
| | | | |
| Wasilla Location: | | | |
| | | | |
| - General clean-up: | $ 1,955.00 | $ - | $ 1,955.00 |
| - Reassembly of tire racks and shelving: | $ 5,000.00 | $ 1,500.00 | $ 1,500.00 |
| - Alignment rack: | $ 5,000.00 | $ 1,000.00 | $ 1,000.00 |
| - Repair Bay 7 lift: | $ 875.00 | $ - | $ - |
| - Repair Back Bay lift: | $ 5,000.00 | $ - | $ 2,500.00 |
| - Heads on RV rack: | $ 1,500.00 | $ - | $ - |
| - Hose reels: | $ 1,000.00 | $ - | $ 875.00 |
| - Lube dispensing head: | $ 1,000.00 | $ - | $ 500.00 |
| - Lube pits: | $ 2,460.00 | $ 500.00 | $ 650.00 |
| - Bathroom equipment: | $ 778.97 | $ 778.97 | $ 778.97 |
| - Blower assembly and faucet replacement: | $ 1,537.70 | $ - | $ - |
| TOTAL Wasilla: | $ 26,106.67 | $ 3,778.97 | $ 9,758.97 |
| | | | |
| **TOTAL Claimed:** | $ 45,522.13 | $ 4,487.43 | $ 14,838.65 |

An order will be entered consistent with this Memorandum.

DATED:   September 20, 2016


BY THE COURT

/s/ Gary Spraker
GARY SPRAKER
United States Bankruptcy Judge


Serve: D. Bundy, Esq.
R. Crowther, Esq.
ECF Participants per NEF
SVS